Henry S. Sherman v. Commissioner. Edith McBride Sherman v. Commissioner. Mary B. Crowell Trust, Central National Bank of Cleveland, Trustee v. Commissioner.
Sherman v. Commissioner
Docket Nos. 110815, 110817, 110816.
United States Tax Court
1943 Tax Ct. Memo LEXIS 167; 2 T.C.M. (CCH) 599; T.C.M. (RIA) 43374; August 4, 1943
*167 Ashley M. Van Duzer, Esq., 2800 Terminal Tower, Cleveland, O., and Arthur E. Griffith, Esq., for the petitioners. W. W. Kerr, Esq., for the respondent. STERNHAGEN Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in 1939 income tax as follows: Henry S. Sherman
$1,256.69
Edith McBride Sherman
1,445.50
Mary B. Crowell Trust, Central Na-
tional Bank of Cleveland, Trustee
4,293.88
The petitioners assail the determination that a trust was an association taxable as a corporation and that a capital gain was realized upon its liquidation in 1939. Findings of Fact Henry S. Sherman and Edith McBride Sherman are husband and wife and filed separate income tax returns in the 18th District of Ohio. Prior to March 1, 1913, Sarah R. Benedict owned two parcels of real estate in the business section of Cleveland, Ohio, one referred to as the Arcade property and the other as the West Side property. In 1886, she executed a 99-year lease covering the Arcade property, at an annual rental of $5,000 payable in quarterly installments, or at such increased rental as may be determined at ten year intervals at the rate of 4 per cent upon the appraisal value of *168 the land but not less than $5,000 a year. The building now on the premises was constructed by the lessee. On or about September 19, 1889, Sarah R. Benedict leased the West Side property for 50 years beginning April 1, 1890, at an annual rental of $1,000 for the first two years, $1,250 for the third year, and $1,500 for the remainder for the term, payable in quarterly installments. All taxes were to be paid by the lessees and all repairs were to be made at their expense. At the expiration of each lease the lessor, her heirs, executors, administrators and assigns, was to pay to the lessee the value of the buildings and improvements erected by the lessee. Sarah R. Benedict died prior to March 1, 1913, and the two parcels descended by inheritance as follows: An undivided one-half interest to Mary B. Crowell, her daughter, and an undivided one-fourth interest to each of her grandchildren, Henry S. Sherman, and his sister, Sarah Sherman Carter, subject to a life estate in their mother, who died in 1929. On May 7, 1925, Mary B. Crowell conveyed her one-half undivided interest in the Arcade property and the West Side property to Central National Bank Savings and Trust Company of Cleveland, *169 now Central National Bank of Cleveland, in trust. The net income was to be paid to the grantor for life, and upon her death $35,000 was to be paid to her daughter, Katharine Crowell Cushing, and the residue was to be divided into three parts and the income of each part was to be paid to each of her three children. Benedict Crowell, Katharine Crowell Cushing, and Robert H. Crowell, during life, or to their issue per stirpes. The trust was terminable twenty years after the death of the last survivor of the three children, whereupon the trust principal, and any accumulated income, was to be distributed to the issue of the deceased children in the same proportions as that of the last distribution of income. This trust agreement has been since its execution and is now in full force and effect. In 1931, the children of the life beneficiaries of the Mary B. Crowell Trust and of Henry S. Sherman and Sarah Sherman Carter numbered about thirteen, and it was feared that partition proceedings might be instituted resulting in a forced sale of the properties. To avoid partition of the properties a trust agreement was made on March 16, 1931, between the Central United National Bank of Cleveland *170 (now Central National Bank), as trustee, and Henry S. Sherman, Sarah Sherman Carter, and Central United National Bank of Cleveland, trustee under the Mary B. Crowell Trust, as second parties. Second parties agreed, contemporaneously with the execution of the trust to convey their rights in and to the Arcade and West Side properties to the trustee. This agreement provides, inter alia: that the trustee shall convert the property into money and disburse the proceeds to the persons owning beneficial interests as evidenced by certificates of interest issued by the trustee; that the trustee may in its uncontrolled discretion postpone such conversion and distribution but not more than twenty years after the death of the last survivor of eighteen persons named in the agreement; that the trustee shall have exclusive control over the trust estate, including: the right to collect all moneys; to require the lessees to carry fire and liability insurance; to pay taxes and assessments against the trust estate not otherwise payable by the lessees; to give necessary attention to the proper management of the trust estate; to execute, without the consent of certificate holders, leases not exceeding *171 ten years; to execute new leases for all or any part of the trust estate for a period of 99 years, renewable forever, with or without purchase option, and for such rents as it may, with the approval of 3/4ths in interest of the certificate holders, deem advisable; to modify any existing lease with the written consent of 3/4ths in interest of the certificates outstanding; to mortgage the trust estate or receive advances, upon the security of the trust estate, for its improvement, protection or preservation, including the payment of taxes and assessments; in the event of partial or total destruction of any building on the lands during the existence of any lease, to take such action as it may deem proper with reference to the repair and restoration of the building, and in the event of the termination of the present long term leases, at the request of 3/4ths in interest of the certificate holders, to tear down the old buildings and to erect new buildings and for such purpose to borrow money and mortgage the trust estate. The trustee was to keep complete records and accounts of business transacted by it, which should be open to inspection to any certificate holder; to render annually a *172 complete statement of its receipts and disbursements, including an inventory, to each certificate holder; to pay out of the income received "any and all expenses incurred in the management of the" trust estate and "any charges and expenses incurred by the Trustee or for which it shall be liable in connection with its management" of the trust estate; to distribute the balance on the 15th of each January, April, July and October among the certificate holders. The trust agreement further provides, that until the conversion of the property the certificate holders shall have no legal estate in the property and no right to partition, their interest consisting only of a right to the net income and the net proceeds upon sale or other disposition; that the death of a certificate holder shall not terminate the trust; that the beneficial interest under the trust shall be divided into 1,200 parts and evidenced by "Trustee's certificates of interest"; that contemporaneously with the execution of the agreement the trust shall issue and deliver certificates of interest as follows: Central United National Bank of Cleve-
land, Trustee under the Mary B. Cro-
well Trust
600/1200
Sarah Sherman Carter
300/1200
Henry S. Sherman
300/1200
*173 Pursuant thereto such certificates were issued. The certificates were transferable in writing and new certificates were to be issued upon a transfer. The trustee in its discretion could call meetings of the certificate holders for the purpose of submitting to them any question or policy in respect to the trust estate. Meetings were also to be called upon the written request of 25 per cent or more of the outstanding certificates specifying the matters to be considered at such meeting. Each holder of a certificate, or proxy, was entitled to "act or vote" at such meetings according to the interest represented by the certificate. The trust was terminable upon the unanimous written request of the certificate holders requiring the trustee to transfer the trust estate to them or their nominee. The trust agreement further provided that the trustee should have no power or authority to borrow money on the credit or on behalf of the certificate holders or to make any contract on their behalf for the repayment of any money, or to bind or to make any contract or incur any liability on behalf of the certificate holders, or to bind them personally. The trustee was to stipulate in all written *174 contracts or obligations that neither the certificate holders nor the trustee should be held to any personal liability. In 1933, petitioner Edith McBride Sherman purchased a 200/1200 interest from her husband, Henry S. Sherman, for $97,000. On June 29, 1939, all of the owners of the certificates of interest terminated the trust, notifying the trustee and requesting it to convey the trust property to them. Shortly thereafter the trustee did so. Benedict Crowell was president of the Central National Bank of Cleveland. During the existence of the 1931 trust the trustee collected the rents, deducted its fees and distributed the balance to the holders of the certificates in proportion to their interests. The lessees took care of repairs, if any. The trustee in 1937, upon the final decision of the beneficiaries, made an adjustment of the rent of the West Side property with The Ohio Postal Telegraph-Cable Company, to which the original 50-year lease had been assigned in 1920. An adjustment of rent based upon a reappraisal of the Arcade property was also made in 1937 or 1938, the negotiations for which were carried on by Henry S. Sherman and Benedict Crowell. On occasions during the depression *175 the trustee called the lessees wich respect to its failure to receive their rent checks on time. The trustee had no occasion to call a formal meeting of the certificate holders. It kept books of account and a record. During the existence of the trust the only transfer of certificates recorded was the one from Henry S. Sherman to Edith McBride Sherman. In determining the deficiencies the respondent determined that the petitioners in 1939 realized long term capital gains from the liquidation of the March 16, 1931, trust as follows: Henry S. Sherman
$ 5,075.66
Mary B. Crowell Trust
30,458.95
Edith McBride Sherman
10,052.99
Opinion STERNHAGEN, Judge: 1. The principal question is whether the 1931 trust was properly characterized by the Commissioner as an association so that it was taxable as a corporation. Internal Revenue Code, § 3797. The characteristics of an association organized in the form of a trust, as this petitioner was, have often been catalogued since the decisions in Morrissey v. Commissioner, 296 U.S. 344, affirming 74 Fed. (2d) 803 (C.C.A. 9th); Swanson v. Commissioner, 296 U.S. 362, *176 affirming 76 Fed. (2d) 651 (C.C.A. 7th); Helvering v. Coleman-Gilbert Associates, 296 U.S. 369, reversing 76 Fed. (2d) 191 (C.C.A. 1st); Helvering v. Combs, 296 U.S. 365, reversing 76 Fed. (2d) 682 (C.C.A. 9th). See also Lewis & Co. v. Commissioner, 301 U.S. 385, reversing 87 Fed. (2d) 1000 (C.C.A. 7th), and compare Cleveland Trust Co. v. Commissioner, 115 Fed. (2d) 481 (C.C.A. 6th). We think that the Commissioner's determination must be sustained under the Supreme Court decisions. The petitioner was the owner and lessor of the Arcade and the West Side properties. Although the leases were for long periods which had begun before the trustee became the owner, and although its principal activity thereafter consisted of the collection of the prescribed rents, it was nevertheless not relieved of the duties of supervising the leases as any lessor would need to do, and in fact it exercised the active functions of an alert lessor on occasions when required; *177 enough, we think, to be called doing business. Thus, for example, it negotiated with tenants in respect of a readjustment of rent or for payment of rent during the depression, when payment had been delayed. As the Supreme Court said in Helvering v. Coleman-Gilbert Associates, supra, it is not the extent of the exercise of powers but the existence of the powers under the trust instrument which characterizes the association, nor is the purpose of the trust to forestall the possibility of partition by a present or future beneficiary an indication that the trust was not carrying on business. Although called a trust, the organization was in substantial ways similar to a corporation. It had centralized management. The beneficiaries were a group who were authorized to meet and direct the trustees. The evidences of their interests were similar to corporate shares, and the certificates were transferable at will, as indeed they were transferred by Henry S. Sherman to his wife by sale for cash. The beneficial interests, like corporate shares, carry proportional voting rights, and these were in fact exercised when the beneficiaries agreed to the 1939 liquidation *178 here in question. The trust survives the death of any of the beneficiaries and twenty years after the death of eighteen named persons. Against this array of circumstances sufficient to bring the trust within the character of association as described in the Supreme Court decisions we see no counter influence. As we have said, the purpose of the owners to set up a form of legal ownership which would be invulnerable to the possible threat of partition does not avoid the association character which the terms of the instrument and the facts of its operation otherwise indicate. We see no escape from applying the tax character of association to the trust and therefore sustain the Commissioner's determination in that respect. 2. The petitioner makes an alternative point that even though this trust be properly regarded as an association, still the liquidation and distribution of the trust in 1939 was not the occasion for the realization of income by the beneficial owners. This contention must fall before Pierce Oil Corporation, 32 B.T.A. 403, 429; Tyrrell v. Commissioner, 91 Fed. (2d)500 (C.C.A. 5th), certiorari denied, 302 U.S. 747. *179 Since the revenue act categorically calls an association a corporation and requires that the members of the association shall be treated as shareholders and the beneficial interests as shares, it is a necessary corollary that the liquidation of the association is to be treated as the liquidation of a corporation. Thus the value of what is received in distribution by the member must be regarded as including as taxable gain the excess over the basis of his beneficial interest or share. The quantum of this excess is not disputed by the petitioner, but only the correctness of the Commissioner's treatment of the distribution of the trust as a distribution in corporate liquidation. Since this treatment is not in error the amount of the 1939 gain of each of these taxpayers is sustained. Senior v. Braden, 295 U.S. 422, dealing with a state tax on intangibles, recognizes Ohio land trust certificates as being real estate under Ohio law, but does not indicate that under federal tax law the liquidation of the taxable association was not an occasion of taxable gain. Decision will be entered for the respondent.